[No. B219352. Second Dist., Div. Four. Aug. 31, 2010.]

COLONY COVE PROPERTIES, LLC, Plaintiff and Respondent, v. CITY OF CARSON, Defendant and Appellant.

**1490**

COUNSEL

Aleshire & Wynder, William W. Wynder, Sunny K. Soltani and Jeff M. Malawy for Defendant and Appellant.

Gilchrist & Rutter, Richard H. Close, Thomas W. Casparian and Yen N. Hope for Plaintiff and Respondent.

OPINION

**MANELLA, J.**—Government Code section 66427.5 contains state-mandated procedures for converting a mobilehome park from landlord ownership to resident ownership.[1] It requires, among other things, that parties seeking conversion to resident ownership obtain a "survey of support of residents of the mobilehome park" and submit the results of the survey to the local entity or agency "to be considered as part of the subdivision map hearing . . . ." (§ 66427.5, subd. (d)(1) & (5).) The statute also provides that the subdivision map hearing "shall be limited to the issue of compliance with this section." (*Id.*, subd. (e).) Respondent Colony Cove Properties, LLC (Colony Cove), the owner of the Colony Cove Mobilehome Park located within the boundaries of appellant City of Carson (City), challenged an ordinance enacted by the City which specified that if the survey of support indicated 50 percent or more of the park residents supported the conversion, it would be presumed bona fide; if the survey indicated resident support of 35 percent or less, the conversion would be presumed not bona fide; and if resident support fell between 35 and 50 percent, the owner would be required to demonstrate a plan to convey the majority of the lots to current residents within a reasonable period of time.

In a lengthy order, the trial court concluded, inter alia, that under section 66427.5 the City's responsibilities when faced with a mobilehome park conversion application were essentially ministerial—that the City was merely to determine whether the survey had been received and filed in accordance with the statute, not to evaluate its contents. The court issued a writ directing the City to vacate the ordinance in its entirety and, in addition, to vacate an ordinance which imposed a moratorium (expired by the time of the hearing) on mobilehome park conversions while the City studied the issue. We reject the trial court's conclusion that the City's role under section 66427.5 is purely ministerial, but nonetheless conclude that the ordinance at issue conflicted with section 66427.5 and is therefore invalid. In addition, we conclude that the issue of the validity of the moratorium was moot at the time the writ was granted. We therefore reverse in part and affirm in part.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *May 2008 Petition*

On May 19, 2008, Colony Cove filed a verified writ petition stating that it wished to convert the mobilehome park it owned from rental-only status to condominium style, in which at least some of the residents would own the

---

[1] Unless otherwise indicated, statutory references are to the Government Code.

land underneath their units and also own an undivided interest in the park's common areas. It submitted an application to the City for a tentative map, which would allow Colony Cove to subdivide the property and sell individual interests.[2] According to the petition, Colony Cove's application "d[id] not contemplate any new building or development; it merely subdivide[d] the property lines to allow for resident ownership of lots in the Park."

The petition further alleged that in February 2008, the City introduced ordinance No. 08-1401. As enacted, ordinance No. 08-1401 provided that "[a] survey of residential support" must be conducted "in compliance with [section 66427.5, subdivision (d)]" and that "[f]or purposes of determining whether a proposed conversion is a bona-fide resident conversion, the following criteria shall be used": (1) "[w]here the survey of resident support . . . shows that more than 50% of resident households support[] the conversion to resident ownership, the conversion shall be presumed to be a bona-fide resident conversion"; (2) "[w]here the survey of resident support . . . shows that at least 35% but not more than 50% of residents support the conversion to resident ownership, the subdivider shall have the burden of demonstrating that the proposed conversion is a bona-fide resident conversion. In such cases, the subdivider shall demonstrate, at a minimum, that a viable plan, with a reasonable likelihood of success as determined by the decision-maker, is in place to convey the majority of the lots to current residents of the park within a reasonable period of time"; (3) "[w]here the survey of resident support . . . shows that less than 35% of residents support the conversion [to] ownership, the conversion shall be presumed not to be a bona-fide resident conversion."[3] (Italics omitted.)

The petition sought a writ of mandate directing the City to vacate ordinance No. 08-1401.

B. *June 2008 Petition*

On June 13, 2008, Colony Cove filed a second verified petition for writ of mandate. The facts alleged concerning Colony Cove's desire to convert its mobilehome park and its application to the City for the approval necessary to subdivide the property and sell individual units were essentially the same as those alleged in the May 2008 petition. However, in the June petition, Colony

---

[2] The petition did not state the date the application was submitted.

[3] The petition stated that the relevant percentage was 20 percent, apparently based on a draft proposal. The parties are in agreement that the determinative percentage in the final ordinance was 35 percent.

Cove additionally alleged that in March 2007, the City adopted an ordinance imposing a 45-day moratorium on converting mobilehome parks to resident ownership. The moratorium ordinance prohibited consideration and approval of any mobilehome park conversion application if such application had not been deemed substantially complete by City staff prior to the effective date of the ordinance. In May 2007, the City adopted an ordinance extending the original moratorium for 10 months and 15 days. Finally, in March 2008, shortly after adopting ordinance No. 08-1401 (the subject of the May 2008 petition), the City adopted ordinance No. 08-1402U, extending the moratorium an additional year.

The June 2008 petition sought a writ of mandate vacating ordinance No. 08-1402U, the last extension moratorium resolution, which at the time had approximately nine months to run. Colony Cove's May 2008 petition and June 2008 petition were consolidated prior to the hearing.

### C. Evidence in Support of Petitions

Prior to the hearing on the petitions, Colony Cove submitted three declarations executed by its counsel, Thomas W. Casparian, who had been involved in the conversion of approximately 25 mobilehome parks to resident ownership since 1998.[4] In the declaration in support of the May 2008 petition, Casparian stated that when park owners attempt to survey residents regarding support for a proposed conversion, "[t]ypically, . . . fewer than fifty percent (50%) of residents even respond to the Survey." Even when a higher percentage of residents respond, Casparian declared, many fail to state whether they support or oppose conversion.[5] Accordingly, Casparian averred, the City's requirement that 50 percent of residents indicate support was a "practical impossibility." Casparian further stated that the City's requirement that in the absence of such support, the owner demonstrate a viable plan to convey the majority of lots to current residents did not take account of an alternative likely scenario: a large number of low-income residents would be unable to purchase but, at the same time, would be entitled under state law to lifetime residence at controlled rents; sale of those spaces could not take place until those residents left or died.

---

[4] The court also took judicial notice, at Colony Cove's request, of certain items in the legislative history of section 66427.5.

[5] According to an exemplar offered into evidence, residents are given the option of responding "decline to state" when surveyed concerning whether they support or oppose the proposed conversion.

In the declaration in support of the June 2008 petition, Casparian stated that Colony Cove's application was initially submitted to the City in November 2006. In December 2006, City staff notified Colony Cove that additional information was needed to complete the application. Colony Cove submitted the information requested in October 2007 and was informed by City staff that the then existing moratorium precluded consideration of the application. In November 2007, City staff advised Colony Cove that the City would begin processing the application, but thereafter informed Colony Cove that its application was still incomplete. In February 2008, the City stated that the existence of a moratorium again precluded consideration of the application.

In a supplemental declaration, Casparian stated that in April 2009, the City notified Colony Cove that its application had been deemed incomplete because it did not demonstrate that the proposed conversion was bona fide. The City noted that according to the survey of support submitted in conjunction with the application, less than 35 percent of the park's residents supported the conversion.

## D. *Evidence in Opposition to Petitions*

The City submitted the declaration of Sheri Repp-Loadsman, its planning manager. Repp-Loadsman stated that in January 2007, the City had applications pending for the conversion of two separate mobilehome parks to resident ownership. In addition, the owner of a third mobilehome park had approached the City about conversion. The third park was located on the site of a former landfill. Concerned about a number of matters, including the possibility that park residents were unprepared to take on the cost of property maintenance and management or the liability for ownership of contaminated land, the City adopted the moratorium and its extensions to enable it to study the issue. During the moratorium, the planning department undertook and completed a study of the impact of mobilehome park conversions by identifying and visiting all the mobilehome parks located within the City, identifying health and safety issues within each park, and holding discussions with residents, managers and owners. Ordinance No. 08-1401, the ordinance challenged in the May 2008 petition, was one result of this process. Repp-Loadsman's declaration indicated the City was contemplating additional regulation in other areas, including park maintenance, parking, open space and fire lanes.

E. *Order Granting Petitions*

At the June 19, 2009 hearing, the court granted the petitions.[6] With respect to the survey ordinance, the trial court stated: "At the hearing on a conversion application, [City] has only the limited power to decide whether the applicant has complied with section 66427.5. [Citation.] This is a ministerial duty to decide whether the requirements of section 66427.5 have been met; City has no discretion to exercise with respect to the tenant survey. Specifically, City decides that the tenant survey has been performed, but does not evaluate its contents for purposes of deciding whether to permit the conversion. Whether a conversion application is bona fide is an issue for a court to decide, and the tenant survey may be evidence in that decision." (Italics omitted.) The court concluded that "[t]he Survey Ordinance . . . conflicts with section 66427.5 as City attempts to impose additional conditions in order to control the conversion process."

With respect to the moratorium, the trial court recognized that section 65858 authorizes a city to adopt emergency zoning ordinances for up to two years to protect the public safety, health and welfare, and that the purpose of the provision "is to allow [a] local legislative body to adopt ordinances prohibiting land uses that may conflict with contemplated general plan amendment[s] or another land use proposal which [the] legislative body is studying or intends to study within [a] reasonable period of time." The court concluded, however, that the City could not "enact a moratorium on conversions for the purpose of studying their impact on affordable housing" because section 66427.5 limited the City "to . . . determining if Colony Cove's application meets its requirements." The court found that the moratorium ordinance had the effect of "frustrat[ing] mobilehome park conversions in contravention of section 66427.5."

Judgments were entered on the petitions. The City's appeal followed.[7]

---

[6] The court subsequently entered separate judgments for each petition. The first ordered issuance of a peremptory writ of mandate directing the City to vacate ordinance No. 08-1401, the survey ordinance. The second ordered issuance of a peremptory writ of mandate directing the City to vacate ordinance No. 08-1402U (the most recent extension of the moratorium) and, in the alternative, deemed the June 2008 petition an action for declaratory relief and declared ordinance No. 08-1402U invalid.

[7] In its reply brief, the City states it has approved the conversion of the Colony Cove park. At oral argument, the parties discussed whether this rendered the appeal from the trial court's decision on the survey ordinance moot. Because Colony Cove mounted a facial challenge to the ordinance itself, rather than an appeal from a denial of its conversion application, the City's approval of the conversion application does not render Colony Cove's challenge to the survey ordinance moot.

## DISCUSSION

### A. Standard of Review

■ "A city or county may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations that do not conflict with general law. (Cal. Const., art. XI, § 7.) If local legislation conflicts with state law, it is preempted by the state law and is void. [Citation.] A conflict exists when the local legislation contradicts state law. Local legislation contradicts state law when it is inimical to it. [Citations.]" *(Reidy v. City and County of San Francisco* (2004) 123 Cal.App.4th 580, 587 [19 Cal.Rptr.3d 894].) In granting the petition for writ of mandate, the trial court ruled as a matter of law that the ordinances at issue conflicted with section 66427.5. We review such determinations de novo. *(Johnson v. City and County of San Francisco* (2006) 137 Cal.App.4th 7, 12 [40 Cal.Rptr.3d 8]; *Tom v. City and County of San Francisco* (2004) 120 Cal.App.4th 674, 678–679 [16 Cal.Rptr.3d 13].)

### B. Survey Ordinance

■ For some time, section 66427.5 has required that at the time of filing a tentative or parcel map, the owner or "subdivider" seeking conversion of a mobilehome park to resident ownership must offer each existing tenant an option to purchase his or her unit or to continue residency as a tenant, file a report on the impact of the conversion upon residents of the mobilehome park, make a copy of the report available to each resident, and comply with rent control provisions contained in the statute. In addition, since 1995 the statute has also provided that the scope of the subdivision map hearing is "limited to the issue of compliance with [section 66427.5]." (§ 66427.5, subd. (e).) The statute was amended in 2002 to require subdividers to obtain a "survey of support of residents of the mobilehome park," and to submit the results of the survey to the local agency authorized to approve, conditionally approve, or disapprove the map. (§ 66427.5, subd. (d)(1), (5).) The survey results are required "to be considered as part of the subdivision map hearing . . . ." *(Id.,* subd. (d)(5).)[8] Ordinance No. 08-1401 mandates a specific level of resident support (50 percent) for a conversion to be presumed bona fide, provides that a low level of resident support (less than 35 percent) will

---

[8] Other subsections of subdivision (d) of section 66427.5 specify the manner in which the survey must be conducted, requiring, inter alia, that it be conducted in accordance with an agreement between the subdivider and any resident homeowners association (subd. (d)(2)), that it be obtained pursuant to a written ballot (subd. (d)(3)), and that it be conducted so as to provide one vote for each mobilehome space (subd. (d)(4)).

result in the conversion being presumed not bona fide, and requires owners with moderate levels of support (between 35 and 50 percent) to demonstrate that "a viable plan, with a reasonable likelihood of success as determined by the decision-maker, is in place to convey the majority of the lots to current residents of the park within a reasonable period of time."

■ Pointing to the language in section 66427.5 requiring it to "consider[]" the survey of support at the subdivision map hearing, the City contends ordinance No. 08-1401 represents its attempt to "appropriately implement the requirements of section 66427.5" and "imposes no conditions outside those already contained in section 66427.5."[9] In the sole published opinion to have interpreted section 66427.5 in its present form, *Sequoia Park Associates v. County of Sonoma* (2009) 176 Cal.App.4th 1270 [98 Cal.Rptr.3d 669] (*Sequoia Park*), the court held that a county ordinance similar to the City's, requiring a survey showing a particular level of resident support for a mobilehome park conversion to be presumed bona fide, conflicted with section 66427.5 because it deviated from the state-mandated criteria for approving a conversion application and added to the exclusive statutory requirements. (176 Cal.App.4th at pp. 1298–1299.) We find no material difference in the provisions of the survey ordinance here and the ordinance the *Sequoia Park* court found incompatible with the language of subdivision (e) of section 66427.5. Like the ordinance invalidated in *Sequoia Park*, the provisions of the City's survey ordinance impose additional requirements in connection with obtaining tentative map approval not expressly authorized by section 66427.5 and prohibited by subdivision (e) of that section. We conclude, therefore, as did the trial court, that ordinance No. 08-1401 is invalid. Where we part ways with the opinion in *Sequoia Park* and the ruling of the trial court is in their conclusions that all local regulation is preempted and, in the case of the trial court, that the City's responsibilities with respect to applications for mobilehome park conversions are purely ministerial.

1. *Background*

a. *Section 66427.5 as Originally Enacted*

Our understanding of section 66427.5 and the limits it places on local power is derived from comparing its earlier provisions and the leading

---

[9] The City does not claim that it is attempting to implement a different state statute which, by its terms, applies to conversion of mobilehome parks. Thus, this case does not present the issue raised in *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2010) 187 Cal.App.4th 1461 [114 Cal.Rptr.3d 838].

authority interpreting them with the current statute. Section 66427.5 is part of the Subdivision Map Act (§ 66410 et seq.; SMA). "The [SMA] is 'the primary regulatory control' governing the subdivision of real property in California." (*Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 996–997 [129 Cal.Rptr.2d 869, 62 P.3d 103], quoting *Hill v. City of Clovis* (2000) 80 Cal.App.4th 438, 445 [94 Cal.Rptr.2d 901].) "The [SMA] vests the '[r]egulation and control of the design and improvement of subdivisions' in the legislative bodies of local agencies, which must promulgate ordinances on the subject. (§ 66411.) The [SMA] generally requires all subdividers of property to design their subdivisions in conformity with applicable general and specific plans and to comply with all of the conditions of applicable local ordinances." (*Gardner v. County of Sonoma, supra*, at p. 997, fn. omitted.) "As used in the [SMA], 'subdivision' means 'the division, by any subdivider, of any unit or units of improved or unimproved land, or any portion thereof, shown on the latest equalized county assessment roll as a unit or as contiguous units, for the purpose of sale, lease or financing, whether immediate or future.' (§ 66424.) Ordinarily, subdivision under the [SMA] may be lawfully accomplished only by obtaining local approval and recordation of a tentative and final map pursuant to section 66426, when five or more parcels are involved, or a parcel map pursuant to section 66428 when four or fewer parcels are involved." (*Id.* at p. 997.) "[T]he [SMA] seeks 'to encourage and facilitate orderly community development, coordinate planning with the community pattern established by local authorities, and assure proper improvements are made, so that the area does not become an undue burden on the taxpayer.' " (*Gardner v. County of Sonoma, supra*, at pp. 997–998, quoting *Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 985 [44 Cal.Rptr.2d 93].)

In 1991, when the Legislature added section 66427.5 to the Government Code, it was applicable only to "filing a tentative or parcel map for a subdivision to be created using financing or funds provided pursuant to Chapter 11 (commencing with Section 50780) of Part 2 of Division 31 of the Health and Safety Code." (Former § 66427.5.)[10] It required the subdivider to "avoid the economic displacement of all nonpurchasing residents" by ensuring that statutorily defined low-income residents who decided not to purchase would be protected by section 66427.5's mandated rent control as long as they resided at the park, and that non-low-income residents who decided not to purchase would be protected by a phased out limitation on raising rents to

---

[10] Health and Safety Code section 50780, enacted in 1984, states that "it is the intent of the Legislature, in enacting this chapter, to encourage and facilitate the conversion of mobilehome parks to resident ownership or ownership by qualified nonprofit housing sponsors or by local public entities . . . ." (Health & Saf. Code, § 50780, subd. (b).)

market level.[11] (Stats. 1991, ch. 745, § 2, p. 3324.) Conversions that did not require the use of public financing under Health and Safety Code section 50780 were governed by section 66427.4, which required the subdivider to apply to the city, county or local agency empowered to approve subdivision maps, and which permitted the entity or agency to "require the subdivider to take steps to mitigate any adverse impact of the conversion on the ability of displaced mobilehome park residents to find adequate space in a mobilehome park." (Stats. 1991, ch. 745, § 1, pp. 3323–3324.) Subdivision (d) of section 66427.4 made clear that its provisions "establishe[d] a minimum standard for local regulation of conversions of mobilehome parks into other uses" and did not "prevent a local agency from enacting more stringent measures." (Stats. 1991, ch. 745, § 1, p. 3324.)[12]

### b. *1995 Overhaul*

In 1995, the Legislature amended sections 66427.4 and 66427.5 to widen the applicability of the latter and limit the applicability of the former. The amendment to section 66427.4 provided in relevant part: "This section shall not be applicable to a subdivision which is created from the conversion of a rental mobilehome park to resident ownership." (Stats. 1995, ch. 256, § 4, pp. 882, 883.) The reference to "a subdivision to be created using financing or funds provided pursuant to [the Health and Safety Code]" was deleted from former section 66427.5, so that the provision applied generally to "a

---

[11] In the case of non-low-income residents who chose not to purchase, the statute provided that "the monthly rent . . . may increase from the preconversion rent to market levels, as defined in an appraisal conducted in accordance with nationally recognized professional appraisal standards, in equal annual increases over a four-year period." (Stats. 1991, ch. 745, § 2, p. 3324.) In the case of low-income residents who chose not to purchase, "the monthly rent . . . may increase from the preconversion rent by an amount equal to the average monthly increase in rent in the four years immediately preceding the conversion, except that in no event shall the monthly rent be increased by an amount greater than the average monthly percentage increase in the Consumer Price Index for the most recently reported period." (*Ibid.*) These provisions remain in the current statute. (See § 66427.5, subd. (f)(1) & (2).)

[12] The 1991 act also provided a simplified method for gaining approval of a proposed conversion where "at least two-thirds of the owners of mobilehomes who are tenants in the mobilehome park sign a petition indicating their intent to purchase the mobilehome park for purposes of converting it to resident ownership." (§ 66428.1, subd. (a).) It did so by adding section 66428.1, permitting a conversion to resident ownership without obtaining approval of a parcel, tentative or final map unless there were "design or improvement requirements necessitated by significant health or safety concerns," an exterior boundary discrepancy required "recordation of a new parcel or tentative and final map," the existing parcels "were not created by a recorded parcel or final map," or the conversion would result in more units than existed prior to the conversion. (Stats. 1991, ch. 745, § 4, pp. 3325–3326.) Section 66428.1 has remained unchanged since its enactment.

subdivision to be created from the conversion of a rental mobilehome park to resident ownership." (Stats. 1995, ch. 256, § 5, p. 883.) The 1995 version of section 66427.5 limited postconversion rent increases in the same manner as the original version of the statute, affording greater protection to low-income than non-low-income residents. In addition, it added provisions intended to "avoid the economic displacement of all nonpurchasing residents" by requiring subdividers to (1) offer all residents the option to purchase their units or to continue residency as a tenant, and (2) file a report on the impact of the conversion and make a copy of the report available to each resident. (Stats. 1995, ch. 256, § 5, p. 883.) New language placed in what was then subdivision (d) provided: "The subdivider shall be subject to a hearing by a legislative body or advisory agency, which is authorized by local ordinance to approve, conditionally approve, or disapprove the map. The scope of the hearing shall be limited to the issue of compliance with this section." (Stats. 1995, ch. 256, § 5, p. 883.)

### c. The Holding in El Dorado

In *El Dorado Palm Springs, Ltd. v. City of Palm Springs* (2002) 96 Cal.App.4th 1153 [118 Cal.Rptr.2d 15] (*El Dorado*), the court held that the 1995 amendments strictly limited the power of cities, counties and local agencies to impose conditions during the subdivision map approval process. The City of Palm Springs, purporting to rely on the language in section 66427.4 permitting local authorities to "enact[] more stringent measures," sought to impose three conditions on a mobilehome park owner seeking conversion: (1) that the sale price for the lots be determined by a specified appraisal firm; (2) that the owner provide financial assistance to residents of the park to facilitate their purchase of lots; and (3) that local rent control provisions continue to apply until a specified number of lots were sold. (96 Cal.App.4th at pp. 1161, fn. 5, 1163.) The court concluded that Palm Springs could not rely on section 66427.4 to justify its imposition of the conditions because, by its terms, that statute applied only when a mobilehome park was converted to uses other than as a mobilehome park. (96 Cal.App.4th at pp. 1161–1162.) Nor, the court held, could Palm Springs rely on section 66427.5—which after 1995 applied to all mobilehome park conversions to resident ownership, whether initiated by the residents or the owner—to support imposition of the proposed conditions. The court concluded that the language of the subdivision limiting the scope of the hearing before the local entity or agency to "the issue of compliance with this section" meant that "the City Council, in acting on [the owner's] application for approval of the tentative subdivision map, only had the power to determine if [the owner] had complied with the requirements of [section 66427.5]." (96 Cal.App.4th at

pp. 1163–1164.) Examining the legislative history of the 1995 amendments, the court further concluded that by including this language, the Legislature intended that no entity or agency be permitted to enact more stringent measures pertaining to the conversion of mobilehome parks to residential ownership than those specified in the statute. (96 Cal.App.4th at pp. 1170–1171.)

Palm Springs, joined by the residents' homeowners association, argued that owners of mobilehome parks would use section 66427.5 to circumvent local rent control provisions by obtaining a subdivision map for a conversion and thereafter continuing to rent out the spaces, selling no lots or only a few lots.[13] While sympathetic to the city's concerns, the court concluded that the language of section 66427.5 limiting the scope of the hearing "to the issue of compliance with this section" deprived Palm Springs of authority to "impose additional conditions to prevent sham or fraudulent transactions at the time it approves the tentative or parcel map." (*El Dorado, supra*, 96 Cal.App.4th at p. 1165.) Acknowledging the possibility of "legislative oversight" and recognizing that "it might be desirable for the Legislature to broaden the City's authority," the court declared the matter "a legislative issue, not a legal one." (*Ibid.*)[14] The trial court ruling was reversed and remanded with directions requiring the Palm Springs City Council "to promptly determine the sole issue . . . whether [the owner's] application for approval of a tentative parcel map complie[d] with section 66427.5" and "[i]f so, [to] approve the application." (96 Cal.App.4th at p. 1182.)

### d. *The 2002 Amendments*

Not long after the decision in *El Dorado*, the Legislature enacted the current version of section 66427.5, amending the statute by adding a new subdivision (d), containing the following language: "(1) The subdivider shall obtain a survey of support of residents of the mobilehome park for the proposed conversion. [¶] (2) The survey of support shall be conducted in

---

[13] This had occurred in *Donohue v. Santa Paula West Mobile Home Park* (1996) 47 Cal.App.4th 1168 [55 Cal.Rptr.2d 282] (*Donohue*). There, residents had initiated the filing of a tentative map, but no lots were ever sold because the residents could not obtain the financing to purchase the park. The court held that the rent control provision of section 66427.5 did not supersede local rent control ordinances where the attempt to convert failed, and that "conversion" meant more than filing the tentative map. (*Donohue*, at pp. 1174–1176.) The court in *El Dorado* concluded that under the holding in *Donohue*, section 66427.5 did not preempt or supersede a local rent control ordinance "if the conversion is unsuccessful," but that section 66427.5's rent control provisions became applicable to nonpurchasing residents "as soon as the first unit is sold." (*El Dorado, supra*, 96 Cal.App.4th at p. 1166.)

[14] The court further noted that residents resisting a fraudulent conversion were not without recourse as, under *Donohue*, "courts will not apply section 66427.5 to sham or failed transactions, or to avoid a local rent control ordinance." (*El Dorado, supra*, 96 Cal.App.4th at p. 1165.)

accordance with an agreement between the subdivider and a resident home-owners' association, if any, that is independent of the subdivider or mobile-home park owner. [¶] (3) The survey shall be obtained pursuant to a written ballot. [¶] (4) The survey shall be conducted so that each occupied mobile-home space has one vote. [¶] (5) The results of the survey shall be submitted to the local agency upon the filing of the tentative or parcel map, to be considered as part of the subdivision map hearing prescribed by subdivision (e)." The Legislature moved former subdivision (d) to subdivision (e), which continued to provide: "The subdivider shall be subject to a hearing by a legislative body or advisory agency, which is authorized by local ordinance to approve, conditionally approve, or disapprove the map. The scope of the hearing shall be limited to the issue of compliance with this section." (§ 66427.5, subd. (e).)

When enacting the 2002 amendments, the Legislature provided the following explanation for the changes: "It is the intent of the Legislature to address the conversion of a mobilehome park to resident ownership that is not a bona fide resident conversion, as described by the Court of Appeal in [*El Dorado, supra,*] 96 Cal.App.4th 1153. The court in [*El Dorado*] concluded that the subdivision map approval process specified in [section 66427.5] may not provide local agencies with the authority to prevent non[-]bona fide resident conversions. The court explained how a conversion of a mobilehome park to resident ownership could occur without the support of the residents and result in economic displacement. It is, therefore, the intent of the Legislature in enacting this act to ensure that conversions pursuant to Section 66427.5 of the Government Code are bona fide resident conversions."[15] (Stats. 2002, ch. 1143, § 2.)

During the amendment process, the Legislature considered and rejected a proposal that would have changed the language of former subdivision (d) (now subd. (e)) to provide: "The subdivider shall be subject to a hearing by a legislative body or advisory agency, which is authorized by local ordinance to approve, conditionally approve, or disapprove the map. The scope of the hearing shall be limited to the issue of compliance with this section *and any additional conditions of approval that the local legislative body or advisory agency determines are necessary to preserve affordability or to protect nonpurchasing residents from economic displacement.*" (Sen. Amends. to

---

[15] The quoted provision is known as a " 'plus section.' " (*People v. Allen* (1999) 21 Cal.4th 846, 858, fn. 13 [89 Cal.Rptr.2d 279, 984 P.2d 486].) "A 'plus section' is a provision of a bill that is not intended to be a substantive part of the code section or general law that the bill enacts, but to express the Legislature's view on some aspect of the operation or effect of the bill." (*Ibid.*; see *People v. Canty* (2004) 32 Cal.4th 1266, 1280 [14 Cal.Rptr.3d 1, 90 P.3d 1168] [legislative statements in uncodified section of statute "do not confer power, determine rights, or enlarge the scope of a measure," but "properly may be utilized as an aid in construing [the] statute"].)

Assem. Bill No. 930 (2001–2002 Reg. Sess.) as amended June 26, 2002, and Aug. 13, 2002, § 1.) The Assembly floor analysis of the final version of the 2002 bill stated that "[t]he fact that a majority of the residents do not support the conversion is not . . . an appropriate means for determining the legitimacy of a conversion. The law is not intended to allow park residents to block a request to subdivide." (Assem. Floor Analysis, Conc. in Sen. Amends. to Assem. Bill No. 930 (2001–2002 Reg. Sess.) as amended Aug. 26, 2002, p. 5.)

e. *The Holding in* Sequoia Park

In *Sequoia Park, supra,* 176 Cal.App.4th 1270, the court reviewed an ordinance enacted by the County of Sonoma. The professed aim of the ordinance was to " 'implement[]' " revised section 66427.5 and " '[t]o ensure that conversions of mobile home parks to resident ownership are bona fide resident conversions in accordance with state law.' " (176 Cal.App.4th at pp. 1274, 1288.) It required, inter alia, that any conversion be " 'a bona fide resident conversion' " and set forth criteria for determining whether an application was bona fide: where more than 50 percent of residents supported the conversion, it would be presumed bona fide; where less than 20 percent of residents supported the conversion, it would be presumed not to be bona fide; and where between 20 and 50 percent of residents supported the conversion, the subdivider would be required to demonstrate the conversion was bona fide by presenting a viable plan to convey the majority of the lots to current residents. (*Id.* at pp. 1291–1292.)

The operator of a mobilehome park who sought to convert it to resident ownership petitioned for a writ of mandate to halt enforcement of the ordinance on the ground it was preempted by section 66427.5. The trial court denied the petition, finding the ordinance merely gave effect to the requirements set forth in section 66427.5.

The Court of Appeal reversed, finding that the ordinance was expressly and impliedly preempted because it entered an area fully occupied by state law. (*Sequoia Park, supra,* 176 Cal.App.4th at pp. 1277–1279, 1292–1298.) The court further held that the ordinance conflicted with section 66427.5 because it "deviat[ed] from the state-mandated criteria for approving a mobilehome park conversion application" and set forth "improper additions to the exclusive statutory requirements of section 66427.5." (176 Cal.App.4th at p. 1299.)

In reaching its conclusion, the court undertook an exhaustive review of the statutory provisions in the area of mobilehome park regulation, including the Mobilehome Residency Law (Civ. Code, §§ 798–799.10), the Mobilehome Parks Act (Health & Saf. Code, §§ 18200–18700), and the Manufactured

Housing Act of 1980 (Health & Saf. Code, §§ 18000–18153). Notwithstanding the presumption against preemption, the court's analysis persuaded it that "the state has taken for itself the commanding voice in mobilehome regulation," leaving localities "little scope to improvise or deviate from the Legislature's script." (*Sequoia Park, supra,* 176 Cal.App.4th at pp. 1279–1281, 1293.)

The court noted that in revising section 66427.5, the Legislature did not disturb the language of former subdivision (d), now subdivision (e), which continued to state that "[t]he scope of the hearing shall be limited to the issue of compliance with this section." Referring to this language, the court stated: "[W]hen [the Legislature] amended section 66427.5, [it] did nothing to overturn the *El Dorado* court's reading of the extent of local power to step beyond the four corners of that statute." (*Sequoia Park, supra,* 176 Cal.App.4th at p. 1297.) Noting that the ordinance imposed requirements in addition to those listed in section 66427.5, including the requirement that the conversion application be shown to be bona fide "as measured against the percentage-based presumptions" set forth in the ordinance, the court concluded that the ordinance directly conflicted with the statutory language. (176 Cal.App.4th at p. 1299.)

Notably, the court did not address what meaning should be ascribed to the language of section 66427.5, subdivision (d) requiring that " '[t]he results of the survey . . . be considered as part of the subdivision map hearing prescribed by subdivision (e).' " Rather, it concluded that because the ordinance imposed conditions that clearly went beyond those set forth in section 66427.5, it violated subdivision (e)'s requirement that the scope of the hearing " 'be limited to the issue of compliance with this section.' " (*Sequoia Park, supra,* 176 Cal.App.4th at pp. 1283, 1293, 1296–1297.)

### 2. *Validity of the City's Survey Ordinance*

■ Determining the validity of the City's survey ordinance turns on a proper construction of section 66427.5. In interpreting a statute, "we must look first to [its] language . . . ." (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047 [80 Cal.Rptr.2d 828, 968 P.2d 539].) "If it is clear and unambiguous our inquiry ends. There is no need for judicial construction and a court may not indulge in it." (*Ibid.*) The rules of statutory interpretation also require that we, "if possible, . . . give effect and significance to every word and phrase of a statute." (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906].) When two provisions touch upon a common subject, "we must construe them 'in reference to each other, so as to "harmonize the two in such a way that no part of either becomes surplusage." [Citations.]' " (*Ibid.,* quoting *DeVita v.*

*County of Napa* (1995) 9 Cal.4th 763, 778–779 [38 Cal.Rptr.2d 699, 889 P.2d 1019].) "We must presume that the Legislature intended 'every word, phrase and provision . . . in a statute . . . to have meaning and to perform a useful function.' " (*Garcia v. McCutchen, supra,* at p. 476, quoting *Clements v. T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 233 [273 P.2d 5].) When the language of a provision is ambiguous and susceptible of more than one reasonable meaning, we may turn to extrinsic aids such as the legislative history of the measure. (*Diamond Multimedia Systems, Inc. v. Superior Court, supra,* at p. 1055.) In addition, " '[w]hen the Legislature amends a statute without altering portions of the provision that have previously been judicially construed, the Legislature is presumed to have been aware of and to have acquiesced in the previous judicial construction. Accordingly, reenacted portions of the statute are given the same construction they received before the amendment.' " (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1156 [278 Cal.Rptr. 614, 805 P.2d 873].)

Colony Cove urges that we follow the example of *Sequoia Park* by holding that the state fully occupies the area of mobilehome park conversion and that local regulation is wholly preempted. That construction would, as the trial court ruled, preclude the City from considering the contents of the survey of support during the subdivision map hearing process and limit it to purely ministerial duties—determining whether the survey had been prepared and filed in accordance with section 66427.5. The problem with this approach is that it fails to satisfactorily reconcile the language of the 2002 amendments with the stated intent of the Legislature. We instead begin our analysis of the ordinance's validity with the language of the statute itself and, in particular, the 2002 amendments.

When the Legislature amended former section 66427.5 in 2002, it did not change the language now contained in subdivision (e), which continues to state that "[t]he scope of the [subdivision map] hearing shall be limited to the issue of compliance with this section." However, the phrase "limited to the issue of compliance with this section" must be interpreted in light of the new language of the preceding subdivision (d). That subdivision requires applicants to obtain a survey of support of the residents of the mobilehome park, conducted in accordance with specific procedures, and to submit "[t]he results" to the entity or agency "authorized by local ordinance to approve, conditionally approve, or disapprove the [subdivision] map." This language alone suggests that the contents of the survey, as opposed to its mere existence, are relevant to the approval process. By thereafter specifically stating that the results are "to be considered as part of the subdivision map hearing prescribed by subdivision (e)," the Legislature made that intention explicit. Construing the statute to eliminate the power of local entities and

agencies to consider the results of the survey when processing a conversion application would consign the "to be considered" language of subdivision (d)(5) to surplusage.

 Nonetheless, we agree with *Sequoia Park*'s specific holding that an ordinance such as the one here conflicts with section 66427.5 by "deviating from the state-mandated criteria" and adding to the "exclusive statutory requirements of section 66427.5." (*Sequoia Park, supra,* 176 Cal.App.4th at p. 1299.) When it overhauled sections 66427.4 and 66427.5 in 1995, the Legislature deprived local entities and agencies of the authority to "enact[] more stringent measures" regulating conversions of mobilehome parks to resident ownership, thereby conveying its intent to prevent localities from unduly impeding resident conversions. (See *El Dorado, supra,* 96 Cal.App.4th at pp. 1161–1163.) The Legislature conveyed the same intent when it enacted the 2002 amendments, rejecting a proposal that would have granted local agencies the authority to impose "any additional conditions of approval that the local legislative body or advisory agency determines are necessary to preserve affordability or to protect nonpurchasing residents from economic displacement."[16] (Sen. Amends. to Assem. Bill No. 930 (2001–2002 Reg. Sess.) as amended June 26, 2002, and Aug. 13, 2002, § 1, italics omitted.) The Legislature's decision to reject this proposal demonstrates that it continues to oppose local deviation from or addition to the statutory criteria. As the court in *Sequoia Park* stated, when the Legislature enacted the 2002 amendments, it "did nothing to overturn the *El Dorado* court's reading of the extent of local power to step beyond the four corners of [section 66427.5]." (*Sequoia Park, supra,* at p. 1297.) By the same token, by adding the provisions requiring the subdivider to obtain and submit a survey of resident support, the Legislature expressly expanded the statutory factors to be considered at the subdivision map hearing to include the results of the survey.

The City contends that its ordinance differs from that invalidated in *Sequoia Park* because the former does not expressly require that a conversion be bona fide in order to be approved. The City does not suggest, however, that it would ever approve a conversion application it found not to be bona fide. On the contrary, one of the stated purposes of the ordinance is "to ensure that conversions of mobilehome parks to resident ownership are bona fide resident conversions in accordance with state law." (Italics omitted.)

---

[16] (See *Central Delta Water Agency v. State Water Resources Control Bd.* (1993) 17 Cal.App.4th 621, 634 [21 Cal.Rptr.2d 453] ["The fact that the Legislature chose to omit a provision from the final version of a statute which was included in an earlier version constitutes strong evidence that the act as adopted should not be construed to incorporate the original provision."]; accord, *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 927 [44 Cal.Rptr.3d 223, 135 P.3d 637].)

■ The City further contends the ordinance does not step beyond the four corners of the statute—that it implements section 66427.5 without imposing additional conditions. The City's contention is not borne out by a comparison of the statutory provisions with the ordinance itself. The statute specifies the ways in which the subdivision must "avoid the economic displacement of all nonpurchasing residents." First, the subdivider must give each resident the option to purchase his or her unit or to continue residency at the park. (§ 66427.5, subd. (a).) Second, the subdivider must file a report on the impact of the conversion on the residents of the mobilehome park and make a copy of the report available to each resident. (*Id.*, subds. (b) & (c).) Third, the subdivider must obtain and submit the survey of support. (*Id.*, subd. (d).) Finally, the subdivider must limit postconversion increases in rents. (*Id.*, subd. (f).)

■ The survey ordinance gives residents additional rights not afforded by the statute. It essentially gives them veto power over the conversion by creating a presumption that the conversion is not bona fide if fewer than 35 percent of residents support it. This provision cannot be reconciled with the final Assembly floor analysis of the 2002 amendments, which specifically stated that "[t]he fact that a majority of the residents do not support the conversion is not . . . an appropriate means for determining the legitimacy of a conversion," and that "[t]he law is not intended to allow park residents to block a request to subdivide." (Assem. Floor Analysis, Conc. in Sen. Amends. to Assem. Bill No. 930 (2001–2002 Reg. Sess.) Aug. 26, 2002, p. 5; see also *El Dorado, supra,* 96 Cal.App.4th at p. 1182 ["The legislative intent to encourage conversion of mobilehome parks to resident ownership would not be served by a requirement that a conversion could only be made with resident consent."].)[17] The ordinance also greatly increases the owner's burden if fewer than 50 percent of residents support it, requiring preparation

[17] A similar issue arose in *El Dorado,* where the homeowners association contended that section 66427.5 applied only to conversions to a "resident-owned" park, defined as a park in which residents held the majority of lots. The court stated: "The Association's interpretation would conflict with the legislative intent to encourage such conversions. Indeed, even the City notes that 'such an onerous condition of approval would effectively give the mobile home park homeowners' association the ability to unilaterally block the proposed park conversion unless the landlord would otherwise set his purchase price at an amount acceptable to the homeowners.' Giving the homeowners this power would conflict with the legislative intent 'to encourage and facilitate the conversion of mobilehome parks to resident ownership . . . .' " (*El Dorado, supra,* 96 Cal.App.4th at pp. 1172, 1174.) The court further noted that the Legislature provided for conversion by resident consent in section 66428.1, which eliminates the tentative map requirement if two-thirds of the residents commit to purchase their units upon conversion. "Thus, if there is the requisite [resident] consent, there is no need to file a tentative map application at all. The absence of such consent does not mean that no conversion is possible; it only means that the filing requirement is not waived. The owner can still subdivide his property by following the statutory procedures, including the economic displacement mitigation measures specified in section 66427.5." (96 Cal.App.4th at p. 1182.)

of a "viable plan" to sell the majority of units to current residents. Moreover, to the extent the requirement of demonstrating a plan to sell to current residents could require the subdivider to offer current residents financial inducements to buy, it potentially provides residents additional financial benefits not conferred by the statute. We thus conclude that ordinance No. 08-1401, like the similar ordinance invalidated in *Sequoia Park*, is an "improper addition[] to the exclusive statutory requirements of section 66427.5." (*Sequoia Park, supra,* 176 Cal.App.4th at pp. 1291–1292, 1298–1299.)[18]

### 3. *Collateral Estoppel*

Prior to Colony Cove's application for conversion, the City had been involved in litigation over the conversion of another mobilehome park.[19] Division Eight of this district, in an unpublished opinion, concluded that the City had not properly considered a resident survey completed after a park owner's original application for conversion was submitted. The court reversed and remanded with directions that the City review the application. Neither of the ordinances before us was at issue in the *Carson Harbor* case.

■ Each party contends that the other is estopped from making certain arguments by the decision of the appellate court in *Carson Harbor*. As we decline to take judicial notice of documents through which the City sought to establish that Colony Cove was in privity with Carson Harbor Village, Colony Cove cannot be estopped from advancing its arguments to this court. (See *Lynch v. Glass* (1975) 44 Cal.App.3d 943, 947 [119 Cal.Rptr. 139] ["A

---

[18] We recognize that our conclusion—that section 66427.5 permits consideration of the results of the survey of support but not the promulgation of an ordinance requiring specific levels of resident support—does not resolve the manner in which the City and other local agencies are to approach conversion applications. The uncertainty derives from the statute itself, which requires local agencies to consider resident survey results but provides no guidance as to how the results may be used. It is our hope that the Legislature will recognize the dilemma faced by local agencies illustrated by this case and another case decided today, *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles, supra,* 187 Cal.App.4th 1461, and act to clarify the scope of their authority and responsibilities.

[19] Colony Cove asked that we take judicial notice of the appellate proceedings in that case, *Carson Harbor Village, Ltd. v. City of Carson* (Mar. 30, 2010, B211777) (nonpub. opn.) (*Carson Harbor*). We granted the request. The City asked that we take judicial notice that Goldstein Properties, LLC, is the general partner of both the Carson Harbor Village and the El Dorado Palm Springs mobilehome parks, and that El Dorado Palm Springs is the manager of Colony Cove. We decline to do so. (See *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325 [48 Cal.Rptr.2d 87, 906 P.2d 1242] [reviewing court need not take judicial notice of matters not before the trial court].)

party cannot assert a prior adjudication against another who was not a party or in privity with a party to the prior action."].) As for Colony Cove's request, we find nothing in the *Carson Harbor* decision to estop the City from arguing that section 66427.5 permits it to consider the resident survey results at the subdivision map hearing.

### C. *Moratorium*

■ Lastly, we consider the City's contention that the validity of the moratorium ordinance was moot by the time Colony Cove's June 2008 petition was heard by the trial court. The duty of the court " ' "is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." ' [Citation.]" (*Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541 [63 Cal.Rptr. 21, 432 P.2d 717].) " '[A]lthough a case may originally present an existing controversy, if before decision it has, through act of the parties or other cause, occurring after the commencement of the action, lost that essential character, it becomes a moot case or question which will not be considered by the court.' " (*Wilson v. L. A. County Civil Service Com.* (1952) 112 Cal.App.2d 450, 453 [246 P.2d 688]; see *Bravo Vending v. City of Rancho Mirage* (1993) 16 Cal.App.4th 383, 393 [20 Cal.Rptr.2d 164] [case may be rendered moot "by an amendment which either repeals or significantly modifies the portion of the ordinance to which the challenge is directed."]; *Native Village of Noatak v. Blatchford* (9th Cir. 1994) 38 F.3d 1505, 1510 ["As a general rule, if a challenged law is repealed or expires, the case becomes moot."].)

■ The ordinance imposing a moratorium on consideration of conversion applications expired several months before the hearing on the writ petitions, after having been in existence for two years. According to the evidence presented, the City completed its study of all the mobilehome parks within its boundaries and the mobilehome park conversion issue during the moratorium. There was no evidence that further studies or moratoriums were planned. The statute on which the City relied—section 65858—permits a moratorium to run for a maximum of two years (§ 65858, subd. (a)) and permits the legislative body to adopt another interim ordinance only where the new interim ordinance arises from "an event, occurrence, or set of circumstances different from the event, occurrence, or set of circumstances that led to the adoption of the prior interim ordinance." (*Id.*, subd. (f).) At the time of the hearing, the moratorium had expired and could not be renewed. Accordingly, Colony Cove's challenge to the moratorium ordinance was moot.

## DISPOSITION

The judgment directing the City to vacate ordinance No. 08-1401 is affirmed. The judgment directing the City to vacate ordinance No. 08-1402U is reversed. The matter is remanded to the trial court with directions to dismiss the petition filed June 13, 2008, as moot. Colony Cove is awarded its costs on appeal.

Epstein, P. J., and Willhite, J., concurred.