187 Cal.App.4th 1461 (2010)
114 Cal. Rptr. 3d 838
PACIFIC PALISADES BOWL MOBILE ESTATES, LLC, Plaintiff and Appellant,
v.
CITY OF LOS ANGELES, Defendant and Appellant.
No. B216515.
Court of Appeals of California, Second District, Division Four.
August 31, 2010.
*1466 Blum Collins and Craig M. Collins for Plaintiff and Appellant.
Bien & Summers, Elliot L. Bien and Amy E. Margolin for Western Manufactured Housing Communities Association as Amicus Curiae on behalf of Plaintiff and Appellant Pacific Palisades Bowl Mobile Estates, LLC.
Carmen A. Trutanich, City Attorney, Jeri L. Burge, Assistant City Attorney, and Amy Brothers, Deputy City Attorney, for Defendant and Appellant.
Aleshire & Wynder, William W. Wynder and Sunny K. Soltani for Palisades Bowl Residents' Association, Inc., and City of Carson as Amici Curiae on behalf of Defendant and Appellant City of Los Angeles.
Law Office of William J. Constantine and William J. Constantine for The Golden State Manufactured Home Owners' League as Amicus Curiae on behalf of Defendant and Appellant City of Los Angeles.

OPINION
WILLHITE, J.
The California Legislature enacted a statuteGovernment Code[1] section 66427.5that facilitates the conversion of mobilehome parks to resident ownership by limiting a local authority's traditional power to regulate development within the local authority's territory when the proposed development is the conversion of a mobilehome park. That statute imposes certain specific requirements on the subdivider seeking the conversion (aimed at preventing the displacement of current residents, particularly those with lower incomes), and provides that the scope of the hearing at which the local authority may approve, conditionally approve, or deny the tentative map "shall be limited to the issue of compliance" with the specific requirements set forth in the statute. (§ 66427.5, subd. (e).)
But the Legislature also enacted a statutesection 65590, part of the Mello Actthat "establishes minimum requirements for housing within the coastal zone for persons and families of low or moderate income" (§ 65590, subd. (k)) and requires local governments to deny the conversion of mobilehome parks within the coastal zone unless certain requirements have been met (§ 65590, subd. (b)). The Legislature also enacted a comprehensive statutory scheme that regulates all development within the coastal zonethe California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.) (the *1467 Coastal Act)a provision of which requires any person wishing to undertake any development within the coastal zone to obtain a coastal development permit from the California Coastal Commission and/or a local agency, depending upon the circumstances. (Pub. Resources Code, § 30600, subd. (a).)
This case presents the question: What happens when conversion to resident ownership is sought for a mobilehome park that is located in the coastal zone? Does the limitation on the scope of the hearing set forth in section 66427.5, subdivision (e), prohibit the local authority from requiring compliance with the Mello Act and the Coastal Act? In this case, the City of Los Angeles (the City) rejected as incomplete the application of Pacific Palisades Bowl Mobile Estates, LLC (Palisades Bowl), for conversion of its mobilehome parkwhich is located in the coastal zonebecause the application failed to include an application for clearance under the Mello Act and an application for a coastal development permit under the Coastal Act. The trial court found that the City abused its discretion by requiring compliance with the Mello Act and requiring Palisades Bowl to apply to the City for a coastal development permit, and entered judgment directing issuance of a peremptory writ of mandamus commanding the City to deem Palisades Bowl's application complete. We conclude that, despite the limiting language in section 66427.5, the Mello Act and Coastal Act apply to a mobilehome park conversion within the coastal zone, and the local authority must ensure compliance with those acts in addition to compliance with section 66427.5.
We also address Palisades Bowl's cross-appeal, challenging the trial court's ruling that the City substantially complied with the requirement under the Permit Streamlining Act (§ 65920 et seq.) to provide, within 30 days after a development application is filed, written notification that the application is incomplete. In light of the record, we affirm that ruling.
Accordingly, we reverse the judgment and remand the matter with directions to deny Palisades Bowl's petition.

BACKGROUND
Palisades Bowl owns a mobilehome park with more than 170 units, located across Pacific Coast Highway from Will Rogers State Beach. In August 2006, residents of the park were told that Palisades Bowl intended to subdivide the park to residential ownership. Concerned about protecting residents in the event of a forced conversion, as well as health and safety issues and code violations at the park, the Palisades Bowl Residents' Association, Inc. (Residents' Association), hired an attorney and, in March 2007, began discussions with Palisades Bowl about a global agreement to satisfy the needs of all parties.
*1468 In the meantime, Palisades Bowl hired an engineering firm to help get approval of its subdivision application. In April 2007, Robert Ruiz, a design engineer/project manager for the engineering firm, went to the City's Division of Land office and asked for a list of items needed to file a mobilehome park conversion application. The person at the counter told him that the City did not have a list specifically for mobilehome park conversions, but there was such a list for tentative tract map applications, which was what Ruiz would need to submit. Later that month, Ruiz spoke by telephone with Lynn Harper, a city planner at the Department of City Planning assigned to supervise the Parcel Map unit within the Division of Land office. They discussed various issues related to the proposed mobilehome park conversion, including the various requirements Harper said Palisades Bowl would need to satisfy to obtain approval. Following that conversation, Harper sent Ruiz a package of materials, including various forms and instructions (such as those related to Mello Act clearances and coastal development permits), and a tract map checklist.
In June 2007, Ruiz again went to the City's Division of Land office, and said he wanted to file an application to convert the mobilehome park. The person at the counter told Ruiz that Palisades Bowl needed to include applications for a zone change and a general plan amendment. Ruiz insisted that under state law, Palisades Bowl did not need a zone change or general plan amendment. The person at the counter told Ruiz that the City would not accept the application because it was incomplete.
Shortly thereafter, Harper asked Michael LoGrande, Chief Zoning Administrator for the Department of City Planning, to assign a case manager to the matter to work directly with Palisades Bowl. LoGrande appointed Richard Ferguson as case manager in August 2007. Over the next few months, Ferguson had several communications with representatives of Palisades Bowl, both telephonic and by e-mail, regarding various issues, including the requirements Palisades Bowl needed to satisfy and the allowable scope of the City's review of the proposed subdivision. At the same time, Ferguson was conducting research and meeting with other City Planning staff to determine exactly what items Palisades Bowl would need to file with its application. On November 9, 2007, he sent an e-mail to a Palisades Bowl representative, to update him on the staff's latest discussion about what was needed. He noted "[t]here is still some discrepancy on what need[s] to be done before the map [application] can be filed," particularly with regard to a zoning issue, and that the staff had not yet decided what the proper vehicle should be to remedy the issue.
Four days later, on November 13, 2007, Ruiz, his superior, and Palisades Bowl's lawyer went to the Division of Land office to submit Palisades *1469 Bowl's conversion application. Harper was called to the counter. She examined the application and found it was missing applications for a zone change, a general plan amendment, a coastal development permit, and a Mello Act affordable housing determination. She told the Palisades Bowl representatives that she would not accept the application for filing, and called Ferguson to the counter. Ferguson told the representatives that the missing applications needed to be included with the conversion application, and that he would send them a followup e-mail. Palisades Bowl's lawyer told Harper and Ferguson that Palisades Bowl believed that the application, which was being submitted under section 66427.5, was complete, and that the City had an obligation to accept the application, review it, and provide a written completeness determination. The representatives left the application on the counter, along with a letter from the lawyer summarizing Palisades Bowl's position that the application is governed by section 66427.5, that the City may not refuse to accept the application, and that the Permit Streamlining Act (Gov. Code, § 65920 et seq.), particularly section 65943, applied to the application.
On November 20, 2007, Ferguson sent an e-mail to Palisades Bowl's engineer, listing "the items you need to file your application." Those items were: (1) an application for a zone change and a general plan amendment; (2) an application for a coastal development permit (Ferguson noted that because the site is in a dual jurisdiction, Palisades Bowl would need clearance from both the City and the Coastal Commission, and the commission requires developers to file with the local agency before filing with the commission); (3) an application to the housing department for clearance under the Mello Act; (4) a copy of the tenant impact report required under section 66427.5, following the format of the City Advisory Agency; and (5) the parcel map application package using form No. CP-1801.[2]
No further action was taken, by the City or Palisades Bowl, until Palisades Bowl filed the petition for writ of mandate and complaint for injunctive and declaratory relief in this case, on January 17, 2008. After amendment, the petition/complaint alleged that the City failed to compile a proper list of items needed to apply for a mobilehome park conversion (i.e., a checklist), improperly refused to accept Palisades Bowl's application, and failed to notify Palisades Bowl in writing of any deficiencies in its application, and therefore the application should be deemed complete under the Permit Streamlining Act. The petition/complaint also alleged that the City lacks *1470 discretion to impose any requirements other than those set forth in section 66427.5, and asked the court to issue a peremptory writ of mandate, injunction, order, or declaration commanding the City to compile a checklist specifically for mobilehome park conversions, deem Palisades Bowl's application complete, process the application under the limited review process mandated by section 66427.5, and make a decision approving or denying the application.[3]
In August 2008, Palisades Bowl filed a motion for a peremptory writ of mandamus and declaratory relief. Although the notice of motion stated that the motion sought a peremptory writ of mandamus commanding the City to, among other things, review the application only for compliance with section 66427.5, Palisades Bowl's memorandum of points and authorities only addressed the City's alleged failure to provide a checklist for mobilehome park conversions and its failure to make a timely completeness determination. The trial court denied the motion. It found that, although the City "probably" violated section 65940 of the Permit Streamlining Act by failing to provide a checklist for mobilehome park conversions, no particular remedy flowed from that failure.[4] But it concluded that Ferguson's November 20 e-mail substantially complied with the Permit Streamlining Act's requirement that the City provide a written completeness determination.
In response to Palisades Bowl's request, the court granted Palisades Bowl leave to file a second amended petition/complaint to address whether the City could require Palisades Bowl to provide the items listed in Ferguson's e-mail. Palisades Bowl filed the second amended petition/complaint,[5] and brought a second motion for peremptory writ of mandate and declaratory relief. It argued that the City abused its discretion by requiring Palisades Bowl to submit any additional items because the City failed to provide a proper checklist. Alternatively, it argued that the City abused its discretion by requiring Palisades Bowl to submit the items set forth in Ferguson's e-mail because those items either were already submitted or they cannot be required in light of section 66427.5. In its opposition to the motion, the City noted that it no longer asserted that Palisades Bowl was required to apply for a zone change or general plan amendment and that no new tenant survey or tenant impact report was required. Thus, the only items the City maintained were *1471 required were a Mello Act clearance, a coastal development permit from the City and the Coastal Commission, and a complete tentative tract map application.
The trial court granted the motion. It found that, under the Permit Streamlining Act, the City could not require Palisades Bowl to submit a complete tentative tract map application because Ferguson's e-mail did not list that as a missing item. The court also concluded that the language of section 66427.5, subdivision (e), precluded the City from requiring compliance with the Mello Act and the Coastal Act. The court entered judgment and issued a peremptory writ of mandamus commanding the City to (1) vacate its November 20, 2007 decision finding Palisades Bowl's application incomplete; (2) deem the application complete; and (3) evaluate the application for approval, conditional approval, or disapproval within the time limits set forth in the applicable statutes and ordinances. The City appeals from the judgment, and Palisades Bowl cross-appeals.

DISCUSSION
On appeal, the City contends the Mello Act and the Coastal Act can be harmonized with section 66427.5, and that the trial court erred by finding that section 66427.5 precluded the City from requiring Palisades Bowl to comply with the Mello Act and Coastal Act. It its cross-appeal, Palisades Bowl contends the trial court abused its discretion in finding that the City satisfied the requirement of the Permit Streamlining Act to provide a written completeness determination. We begin our analysis with Palisades Bowl's contention in its cross-appeal.

A. Must the Application Be Deemed Complete Under the Permit Streamlining Act

(1) The California Legislature enacted the Permit Streamlining Act in 1977, declaring "that there is a statewide need to ensure clear understanding of the specific requirements which must be met in connection with the approval of development projects and to expedite decisions on such projects." (§ 65921.) The act requires every state and local agency to "compile one or more lists that shall specify in detail the information that will be required from any applicant for a development project" and to make those lists available to all applicants and any person who requests that information. (§ 65940, subd. (a).) The lists must also indicate the criteria the agency will apply to determine the completeness of an application submitted to it. (§ 65941.) After an application is received by an agency, the agency must "determine in writing whether the application is complete and . . . immediately transmit the determination to the applicant." (§ 65943, subd. (a).) If the *1472 determination is not made within 30 days after the application is received, the application "shall be deemed complete for purposes of this chapter." (Ibid.) If, within the 30-day period, the application is determined not to be complete, the determination must "specify those parts of the application which are incomplete and . . . indicate the manner in which they can be made complete, including a list and thorough description of the specific information needed to complete the application." (Ibid.) The completion determination is critical, because once an application is accepted as complete, the agency cannot require additional information or documentation not previously specified, although it can require the applicant to clarify, amplify, correct, or otherwise supplement the information required for the application. (§ 65944, subd. (a).)
In its cross-appeal, Palisades Bowl argues that the trial court abused its discretion by finding the City made a timely completeness determination because (1) the City could not have made a completeness determination because it did not maintain any checklist specifically for mobilehome park conversions; (2) the City improperly refused to accept Palisades Bowl's application; and (3) Ferguson's November 20 e-mail was insufficient to satisfy the requirement of a written determination.[6]

1. Failure to Maintain Checklist

(2) Palisades Bowl argues that section 65942 of the Permit Streamlining Act precludes the City from making a determination that Palisades Bowl's application was incomplete. That statute requires agencies to revise the checklists mandated by section 65940 as needed to keep them current and accurate, and provides that those revisions can only be applied prospectively; the statute states that, except in certain circumstances, an agency cannot determine that an application is incomplete for failing to include information *1473 required by a revision made after the application was submitted. (§ 65942.) Palisades Bowl reasons that, since the City did not maintain a checklist for mobilehome park conversions, under section 65942, the City cannot determine that an application is incomplete for failing to include items that do not appear on the required checklist, and therefore Palisades Bowl's application should be deemed complete. We are not convinced.
(3) There is no question that the City did not maintain a list specifically for mobilehome park conversions.[7] But as the trial court correctly noted, to the extent the City's failure to do so violated section 65940, the Permit Streamlining Act does not provide a remedy for any such violation. Contrary to Palisades Bowl's argument, section 65942 does not require that the application be deemed complete. That statute simply precludes prospective application of revisions to a list. In any event, the City did maintain (and provided to Palisades Bowl) a list that it contended applied to Palisades Bowl's proposed conversion, albeit one that included numerous items that could not be required under section 66427.5. As the trial court properly found, the only effect of sections 65940 and 65942 is to preclude the City from requiring any items not on the list it provided to Palisades Bowl.

2. Refusal to Accept Application

(4) Palisades Bowl argues that the City's refusal to accept its application on November 13, 2007, was improper because it was an attempt to avoid the time limit set forth in the Permit Streamlining Act for making a completeness determination. We agree that the City cannot circumvent the Permit Streamlining Act by refusing to accept an application for filing. (See Beck Development Co. v. Southern Pacific Transportation Co. (1996) 44 Cal.App.4th 1160 [52 Cal.Rptr.2d 518].) But while the City's refusal was improper and is not to be condoned, it is irrelevant here because, as the trial court noted, the City acted on the application by timely sending an e-mail explaining why the application was incomplete.

3. Ferguson's E-mail as Completeness Determination

Palisades Bowl argues that Ferguson's e-mail should not be considered a completeness determination under section 65943 because (1) the e-mail stated the five items listed were the items Palisades Bowl needed to file its *1474 application; (2) section 65943 requires the completeness determination to be in writing, and the e-mail does not constitute a "written" determination as defined in the Los Angeles Municipal Code; and (3) the e-mail could not constitute an official action by the City because it did not comply with certain provisions of the municipal code related to actions taken on tentative maps.[8] We conclude the trial court did not abuse its discretion in finding that the e-mail constituted substantial compliance with section 65943.
First, as the trial court observed, "[w]hile there is no language in the e-mail suggesting that it constitutes the City's completeness determination under the Permit Streamlining Act, and Ferguson's e-mail concedes that the application has not been accepted for filing, it is quite clear from the e-mail that Palisades Bowl needed to present five [specified] items. . . . Clearly, Furguson determined that the Application was not complete." The court cited Lewis v. City of Hayward (1986) 177 Cal.App.3d 103 [222 Cal.Rptr. 781] in support of its finding of substantial compliance. In that case, the appellate court found substantial compliance where a city failed to provide a formal written determination of completeness to the developers, but it made clear through repeated requests for additional information that it did not consider the applications to be complete. (Id. at p. 112.) Although the trial court here acknowledged that the case was distinguishable on several grounds, it nevertheless found the case was support for its conclusion that the City in this case substantially complied with its statutory duty to provide a formal determination of completeness by sending an e-mail that stated exactly what five items were required for completeness. We agree. The Ferguson e-mail communicated to Palisades Bowl that its application was not complete, and that it needed to provide five specific items for the application to be deemed complete.
(5) Palisades Bowl's argument that the e-mail could not be a completeness determination due to lack of compliance with the Los Angeles Municipal Code is not persuasive. While it is true that the e-mail may not constitute "written" "notice" as defined in sections 11.01(a) ("written") and 11.00(i) ("notice") of the municipal code, those definitions apply only to words used or requirements set forth in the municipal code. (See L.A. Mun. Code, §§ 11.00(i) ["Whenever a notice is required to be given under this Code . . ." (italics added)], 11.01(a) ["The following words and phrases whenever used in this Code shall be construed as defined in this section." (italics added)].) Thus, the municipal code definitions do not control the determination whether Ferguson's e-mail satisfies the Permit Streamlining Act. Similarly, the requirements set forth in section 17.06 of the municipal code, delineating the process to be used by the City when taking action on a tentative map, do not *1475 apply because a completeness determination is not an action taken on a tentative map. As the code provision itself makes clear, the "action" at issue is the City's approval, conditional approval, or disapproval of a tentative map (L.A. Mun. Code, § 17.06(A)(2))an action that cannot occur until after the tentative map application is deemed complete.
In short, the trial court did not abuse its discretion by finding that Palisades Bowl was not entitled to have its application deemed complete due to the City's failure to comply with the Permit Streamlining Act.

B. Does Section 66427.5 Preclude the City from Requiring Compliance With the Mello and Coastal Acts

Having determined that the City substantially complied with the Permit Streamlining Act, we turn now to the issue raised by the City's appeal: whether the limitation on the City's discretion set forth in section 66427.5 precludes the City from requiring compliance with the Mello Act and the Coastal Act. We begin our analysis with an examination of the language of the relevant statutes.

1. Section 66427.5

Section 66427.5 is primarily directed to the protection of mobilehome park residents in the event of a conversion of the park to resident ownership. It provides as follows:
"At the time of filing a tentative or parcel map for a subdivision to be created from the conversion of a rental mobilehome park to resident ownership, the subdivider shall avoid the economic displacement of all nonpurchasing residents in the following manner:
"(a) The subdivider shall offer each existing tenant an option to either purchase his or her condominium or subdivided unit, which is to be created by the conversion of the park to resident ownership, or to continue residency as a tenant.
"(b) The subdivider shall file a report on the impact of the conversion upon residents of the mobilehome park to be converted to resident owned subdivided interest.
"(c) The subdivider shall make a copy of the report available to each resident of the mobilehome park at least 15 days prior to the hearing on the map by the advisory agency or, if there is no advisory agency, by the legislative body.
*1476 "(d)(1) The subdivider shall obtain a survey of support of residents of the mobilehome park for the proposed conversion. . . . [The remainder of subdivision (d) specifies how the survey is to be conducted, and provides that "[t]he results of the survey shall be submitted to the local agency upon the filing of the tentative or parcel map, to be considered as part of the subdivision map hearing prescribed by subdivision (e).']
"(e) The subdivider shall be subject to a hearing by a legislative body or advisory agency, which is authorized by local ordinance to approve, conditionally approve, or disapprove the map. The scope of the hearing shall be limited to the issue of compliance with this section.
"(f) The subdivider shall be required to avoid the economic displacement of all nonpurchasing residents in accordance with the following:
"(1) As to nonpurchasing residents who are not lower income households, as defined in Section 50079.5 of the Health and Safety Code, the monthly rent . . . may increase from the preconversion rent to market levels . . . in equal annual increases over a four-year period.
"(2) As to nonpurchasing residents who are lower income households, as defined in Section 50079.5 of the Health and Safety Code, the monthly rent . . . may increase from the preconversion rent by an amount equal to the average monthly increase in rent in the four years immediately preceding the conversion, except that in no event shall the monthly rent be increased by an amount greater than the average monthly percentage increase in the Consumer Price Index for the most recently reported period." (§ 66427.5.)
Two portions of the statute are important for this case. The first is subdivision (f) of section 66427.5, quoted immediately above, which seeks to "avoid the economic displacement of all nonpurchasing residents" by providing specified rent controls for statutorily defined "lower income households" for the duration of their mobilehome tenancies (subd. (f)(2)), and by providing for yearly rent increases over a four-year period up to market level for nonpurchasing residents who are not "lower income households" (subd. (f)(1)). These rental protections for nonpurchasing residents are important in considering whether section 66427.5 forbids local agencies from enforcing the Mello Act (§§ 65590, 65590.1).
The second critical portion of section 66427.5 is subdivision (e), providing that the scope of the hearing at which the local agency must approve, conditionally approve, or disapprove the proposed tentative map "shall be limited to the issue of compliance with this section." (§ 66427.5, subd. (e).) Two prior decisions interpreting subdivision (e) have held that it precludes *1477 local authorities from "inject[ing] . . . factors [other than those set forth in the statute] when considering an application to convert an existing mobilehome park from a rental to a resident-owner basis." (Sequoia Park Associates v. County of Sonoma (2009) 176 Cal.App.4th 1270, 1297 [98 Cal.Rptr.3d 669]; see also El Dorado Palm Springs, Ltd. v. City of Palm Springs (2002) 96 Cal.App.4th 1153, 1163-1164 [118 Cal.Rptr.2d 15] [the city did not have power to impose mitigating conditions on mobilehome park owner].) Neither decision, however, addressed a situation in which the local authority imposed requirements that it contended were mandated by another state statute, and thus neither controls here.
We noted this distinction in another case decided today, Colony Cove Properties, LLC v. City of Carson (2010) 187 Cal.App.4th 1487, in which we invalidated a local ordinance of the City of Carson. That ordinance specified, through shifting presumptions based on the percentage of residents' support, how the survey of residents required by section 66427.5, subdivision (d)(1) would be considered by the local agency in determining whether to approve a proposed conversion as a "`bona-fide resident conversion.'" (Colony Cove, supra, 187 Cal.App.4th at p. 1492.) Finding no material difference between the Carson ordinance and the one disapproved in Sequoia Park (id. at p. 1497), we invalidated the Carson ordinance, and agreed with the holding of Sequoia Park to the extent it precludes enforcement of local ordinances that "conflict[] with section 66427.5 by `deviating from the state-mandated criteria' and adding to the `exclusive statutory requirements of section 66427.5.' [Citation.]" (Id. at p. 1506.) However, based on the language of subdivision (d)(5) of section 66427.5, which provides that "[t]he results of the survey shall be submitted to the local agency . . ., to be considered as part of the subdivision map hearing prescribed by subdivision (e)," we disagreed with Sequoia Park to the extent it "[c]onstru[ed] the statute to eliminate the power of local entities and agencies to consider the results of the survey when processing a conversion application." (Colony Cove, supra, 187 Cal.App.4th at pp. 1505-1506, italics added.) As we noted in Colony Cove, our decision in that case (like the prior decisions in Sequoia Park and El Dorado) did not address the issue raised here, involving the contention that the local authority has imposed additional requirements mandated by a different state statute. (Id. at p. 1497, fn. 9.)

2. The Mello Act

(6) The Mello Act (§§ 65590, 65590.1) was enacted in 1981 "to preserve residential housing units occupied by low- or moderate-income persons or families in the coastal zone." (Venice Town Council, Inc. v. City of Los Angeles (1996) 47 Cal.App.4th 1547, 1552-1553 [55 Cal.Rptr.2d 465] (Venice Town Council); accord, Coalition of Concerned Communities, Inc. v. City of Los *1478 Angeles (2004) 34 Cal.4th 733, 738 [21 Cal.Rptr.3d 676, 101 P.3d 563].) The act "transferred the responsibilities for providing affordable housing within the coastal zone from the Coastal Commission to local governments." (Coalition of Concerned Communities, Inc. v. City of Los Angeles, supra, 34 Cal.4th at p. 741 (conc. opn. of Moreno, J.).) It is undisputed that Palisades Bowl is located within the coastal zone.
Section 65590 provides in relevant part: "(a) In addition to the requirements of Article 10.6 (commencing with Section 65580), the provisions and requirements of this section shall apply within the coastal zone as defined and delineated in [the Coastal Act]. Each respective local government shall comply with the requirements of this section in that portion of its jurisdiction which is located within the coastal zone. [¶] (b) The conversion or demolition of existing residential dwelling units occupied by persons and families of low or moderate income, as defined in Section 50093 of the Health and Safety Code, shall not be authorized unless provision has been made for the replacement of those dwelling units with units for persons and families of low or moderate income. Replacement dwelling units shall be located within the same city or county as the dwelling units proposed to be converted or demolished. The replacement dwelling units shall be located on the site of the converted or demolished structure or elsewhere within the coastal zone if feasible, or, if location on the site or elsewhere within the coastal zone is not feasible, they shall be located within three miles of the coastal zone. . . . [¶] (g) As used in this section: [¶] (1) `Conversion' means a change of a residential dwelling, including a mobilehome, as defined in Section 18008 of the Health and Safety Code, or a mobilehome lot in a mobilehome park, as defined in Section 18214 of the Health and Safety Code . . . to a condominium, cooperative, or similar form of ownership." The remainder of the statute provides requirements and guidelines to assist the local authority in carrying out its duties under the statute, the details of which are not relevant for the purposes of this case.
(7) The relevant language makes clear that the focus of the Mello Act is the preservation of affordable housing units for low- and moderate-income persons and families within the coastal zone. Thus, subdivision (b) of section 65590 forbids local agencies from approving any conversion or demolition of existing affordable housing "unless provision has been made for the replacement of those dwelling units with units for persons and families of low or moderate income," which replacement units are to be located "within the coastal zone if feasible, or, if location on the site or elsewhere within the coastal zone is not feasible, they shall be located within three miles of the coastal zone." The court in Venice Town Council observed that section 65590, subdivision (b) "imposes a mandatory duty on local governments to require replacement housing as a condition of granting a permit to demolish or convert housing units which are occupied by low or moderate income *1479 persons or families." (Venice Town Council, supra, 47 Cal.App.4th at p. 1553.) As we discuss, post, the Mello Act's focus on the continued availability of affordable housing units in the coastal zone must be contrasted with the considerably more limited focus of the rental protections provided by section 66427.5, subdivision (f), which protect only against economic displacement of current nonpurchasing residents of the mobilehome park being converted.

3. The Coastal Act

(8) The Coastal Act "is an attempt to deal with coastal land use on a statewide basis." (Yost v. Thomas (1984) 36 Cal.3d 561, 571 [205 Cal.Rptr. 801, 685 P.2d 1152]; see also Charles A. Pratt Construction Co., Inc. v. California Coastal Com. (2008) 162 Cal.App.4th 1068, 1075 [76 Cal.Rptr.3d 466] ["a fundamental purpose of the Coastal Act is to ensure that state policies prevail over the concerns of local government"].) While the California Coastal Commission has "the primary responsibility for the implementation of the provisions of [the Coastal Act] and is designated as the state coastal zone planning and management agency for any and all purposes" (Pub. Resources Code, § 30330), the act gives to local governments a substantial role in land use decisions. (See, e.g., Pub. Resources Code, §§ 30500, 30519, 30600, 30600.5.)
(9) Several provisions of the Coastal Act are relevant to this case. The first is Public Resources Code section 30600, subdivision (a), which provides: "Except as provided in subdivision (e) [which provides for exceptions in the case of emergency work], and in addition to obtaining any other permit required by law from any local government or from any state, regional, or local agency, any person . . . wishing to perform or undertake any development in the coastal zone, other than a facility subject to Section 25500, shall obtain a coastal development permit." The remainder of section 30600 delineates whether the coastal development permit is to be obtained from the local government or the Coastal Commission. Subdivision (b)(1) gives local governments the option, before its local coastal program is certified, to "establish procedures for the filing, processing, review, modification, approval, or denial of a coastal development permit."[9] (Pub. Resources Code, § 30600, subd. (b)(1).) If a local government does not exercise this option, the coastal development permit must be obtained from the Coastal Commission until the local government's local coastal program is certified. (Pub. *1480 Resources Code, § 30600, subd. (c).) Once a local coastal program is certified, the coastal development permit must be obtained from the local government. (Pub. Resources Code, § 30600, subd. (d).)
(10) Another statute that relates to whether a local government or the Coastal Commission is responsible for issuing coastal development permits is Public Resources Code section 30600.5. That statute mandates the delegation of authority for issuing coastal development permits to local governments within 120 days after certification of a land use plan (one of two parts of a local coastal program), unless the development is subject to Public Resources Code section 30519 or 30601. (Pub. Resources Code, § 30600.5, subd. (b).) Public Resources Code section 30601 provides that in certain areas within the coastal zone, a coastal development permit must be obtained from both the local government (if authority for issuing permits has been delegated to the local government) and the Coastal Commission. (These areas generally are referred to as dual jurisdiction zones; it is undisputed that Palisades Bowl is in a dual jurisdiction zone.)
If a local government exercises its option under Public Resources Code section 30600, subdivision (b), several regulations promulgated pursuant to the Coastal Act "to enable the California Coastal Commission to carry out the purposes and provisions of the Act" (Cal. Code Regs., tit. 14, § 13001) govern. Section 13302 of title 14 of the California Code of Regulations sets out the required content of a coastal development permit program, and sections 13303 through 13307 set forth the procedure to be used for adopting such a program. Most important for our purposes, section 13301 provides that, "[f]ollowing the implementation of a coastal development permit program by a local government . . . any person wishing to perform a development within the affected jurisdiction . . . shall obtain a coastal development permit from the local government. If the development is one specified in Public Resources Code [section] 30601, a permit must also be obtained from the commission in addition to the permit otherwise required from the local government; in such instances, an application shall not be made to the commission until a coastal development permit has been obtained from the appropriate local government." (Cal. Code Regs., tit. 14, § 13301.)
(11) Together, these statutes and regulations establish that, before certification of a local coastal program, authority to issue coastal development permits must be delegated to the local government in two circumstances: if a land use plan has been certified (Pub. Resources Code, § 30600.5, subd. (b)), or if the local government exercises its option under Public Resources Code section 30600, subdivision (b)(1) and adopts a coastal development permit program that is accepted by the Coastal Commission (Pub. Resources Code, § 30620.5, subd. (b); Cal. Code Regs., tit. 14, § 13301). As relevant to this case, the City exercised its option in 1978, and the Coastal Commission *1481 accepted the City's program, issuing a "public information memo" to "all interested parties" stating that "[a]s of November 27, 1978, the City of Los Angeles will assume primary authority for issuing coastal development permits for those portions of the coastal zone located within the city limits of the City of Los Angeles." The memo provided a summary of the permit issuing system the City would employ, and noted that there were certain dual jurisdiction zones in which coastal development permits would have to be obtained from both the City and the Coastal Commission. The memo also stated that "[a]ny development that requires a coastal commission permit in addition to a coastal permit from the City of Los Angeles must first obtain its coastal permit from the City of Los Angeles before applying for a permit from the [Coastal] Commission. . . . In other words, where dual permits are required, no one may apply to the coastal commission for a permit until after the City of Los Angeles has completed its action on the coastal permit application and has so notified the [Coastal] Commission."
(12) The final provision of the Coastal Act relevant to this case is Public Resources Code section 30106, which defines "development," since a coastal development permit is required only if a person "wish[es] to perform or undertake any development in the coastal zone." (Pub. Resources Code, § 30600, subd. (a).) "Development" is defined as, among other things, "change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use." (Pub. Resources Code, § 30106.) Thus, a project that involves a subdivision under the Subdivision Map Act constitutes development for the purposes of the Coastal Act. (Cf. La Fe, Inc. v. County of Los Angeles (1999) 73 Cal.App.4th 231, 240 [86 Cal.Rptr.2d 217] ["Section 30106 by its terms recognizes that a subdivision of land or a lot split can result in changes in the density or intensity of use of property."].) There is no question that the conversion of a mobilehome park to resident ownership is a subdivision under the Subdivision Map Act. Government Code section 66427.5, which governs such conversions, is part of the Subdivision Map Act, and the statute itself refers to the "subdivision to be created from the conversion of a rental mobilehome park to resident ownership." (See also El Dorado Palm Springs, Ltd. v. City of Palm Springs, supra, 96 Cal.App.4th at p. 1160 [noting that mobilehome park conversion is a subdivision under the definition of "subdivision" found in § 66424].) Thus, a mobilehome park conversion is a "development" for which a coastal development permit is required under the Coastal Act. (See California Coastal Com. v. Quanta Investment Corp. (1980) 113 Cal.App.3d 579 [170 Cal.Rptr. 263] [holding that the conversion of existing apartment units into a stock cooperative form *1482 of ownership constitutes a development which falls within the permit jurisdiction of the various coastal commissions under the California Coastal Act of 1976].)

4. The Conflict Between Section 66427.5 and the Mello and Coastal Acts

As the above discussion demonstrates, there are three statutory mandates involved in this case: (1) section 66427.5 requires the City to limit its hearing on the approval or disapproval of Palisades Bowl's application to the issue of compliance with the requirements of that statute (i.e., whether Palisades Bowl offered each existing tenant the option to purchase or continue residency as a tenant, filed a tenant impact report and made a copy available to each resident, and obtained a tenant support survey in accordance with the statute); (2) the Mello Act requires the City to deny the conversion unless provision is made for the preservation of low- and moderate-income housing units; and (3) the Coastal Act requires Palisades Bowl to apply to the City and the Coastal Commission for, and the City to review the application for, a coastal development permit. The statutes create a conflict of mandates: the City cannot comply with the mandates of the Mello and Coastal Acts while also complying with section 66427.5's mandate to limit its consideration of Palisades Bowl's conversion application to compliance with section 66427.5.
The trial court concluded that the mandatory duty required by the Mello Act was superseded by section 66427.5 for two reasons. First, the court found that the language of section 66427.5 was a clear "expression of the Legislature's intent to limit a local authority's power to impose conditions" on a mobilehome park conversion. Second, the court found that, because section 66427.5 provides protection for low-income nonpurchasing residents in the form of rent control, and the purpose of the Mello Act is to protect low- and moderate-income tenants, "[t]his dual protection of mostly the same persons shows that the Legislature intended the specific statute (section 66427.5) to control over the more general Mello Act."
On close inspection, we cannot agree with the trial court's reasoning. The Mello Act and section 66427.5 do not offer the same protections to "mostly" the same persons. As we have noted, section 66427.5, subdivision (f), protects against economic displacement only of current "nonpurchasing residents" of the mobilehome park being converted. Subdivision (f)(2) provides that for "nonpurchasing residents" who are classified as "lower income households," rent is controlled during the current tenancy. But once such residents depart, the units may be sold or rented to anyone, regardless of income. They are thus lost as affordable housing units, with no requirement that they be replaced, resulting in a decrease over time in the number of units available to low-income persons or families.
*1483 Similarly, for current residents classified as "not lower income households," subdivision (f)(1) of section 66427.5 provides only the limited protection of specified yearly rental increases over a four-year period up to market level. There is no restriction on the amount of rent that may be charged thereafter. Thus, there is only a modest short-term protection for moderate-income tenants while they reside in their units. And of course, once vacated, the units may be sold or rented without any affordable housing restriction whatsoever.
That the Legislature enacted these protections against the economic displacement of current nonpurchasing residents does not mean it intended to supplant application of the Mello Act to mobilehome park conversions in the coastal zone. Over time, the effect of section 66427.5, subdivision (f), is a decrease in the availability of housing units for low- and moderate-income persons or families. As applied to the limited geographic area of the coastal zone, this result contravenes the specific mandate of the Mello Act, which forbids local agencies from approving "[t]he conversion . . . of existing residential dwelling units [in the coastal zone] occupied by persons and families of low or moderate income, . . . unless provision has been made for the replacement of those dwelling units with units for persons and families of low or moderate income." (§ 65590, subd. (b).)[10] Put differently, the Mello Act preserves the availability of housing units in the coastal zone dedicated to persons and families of low or moderate income; section 66427.5 would diminish the availability of such dedicated housing units. In short, the protections for low- and moderate-income persons and families provided by section 66427.5 do not provide the kind of protection so clearly mandated by the Mello Act.
(13) We also do not agree with the trial court's conclusion that section 66427.5 is the more specific statute and therefore supersedes the Mello Act. It is true that "[u]nder well-established principles of statutory interpretation, the more specific provision . . . takes precedence over the more general one . . . . [Citations.] To the extent a specific statute is inconsistent with a general statute potentially covering the same subject matter, the specific statute must be read as an exception to the more general statute." (Salazar v. Eastin (1995) 9 Cal.4th 836, 857 [39 Cal.Rptr.2d 21, 890 P.2d 43], (citations omitted.) But this principle applies only where the court can state with confidence that, as applied to the subject matter at hand, one statute is truly more specific. Here, *1484 in terms of subject matter, each statute is both general and specific: section 66427.5 is specific as to the type of development it governs but general as to the location of that development; the Mello Act is general as to the type of development it governs (although it specifically includes mobilehome park conversions) but specific as to the location of the development. Thus, it cannot be said, as applied to conversions of mobilehome parks located in the coastal zone, that section 66427.5 (which applies specifically to mobilehome park conversions but generally as to location) is more specific than the Mello Act (which applies specifically to developments in the coastal zone but generally to the category of development).
With regard to the Coastal Act, the trial court found that the City's requirement that a developer obtain a coastal development permit from the City was not a requirement mandated by statute because "[t]he Coastal Act allows, but does not require, a local agency such as the City to adopt local procedures requiring an applicant to obtain a coastal development permit from that local agency first." Thus, the court concluded the City's requirement was mandated only by the City's local law and therefore section 66427.5 preempts that local law. Again, we disagree.
That the City elected in 1978 to exercise its option under Public Resources Code section 30600, subdivision (b)(1), does not make the requirement to obtain a coastal development from the City a local requirement rather than a state mandate. As discussed above, under the relevant statutes and regulations, once the City adopted a coastal development permit program that was accepted by the Coastal Commission, the requirement for developers to obtain a coastal development permit from the City became a state mandate. (Pub. Resources Code, §§ 30600, subd. (b), 30620.5, subd. (b); Cal. Code Regs., tit. 14, § 13301.)
(14) We are thus left with two state mandates (the Mello Act and the Coastal Act) that conflict with a third state mandate (§ 66427.5). Application of the ordinary rules of statutory constructionexamination of the plain meaning of the statutory text and the legislative history to determine legislative intentdoes not assist us here, because neither the statutory text nor the legislative history provides insight into the legislative intent as to which statute prevails. In such cases, the Supreme Court instructs us to "turn to an analysis of the relevant policy considerations as they bear on the question of legislative intent." (Mejia v. Reed (2003) 31 Cal.4th 657, 668 [3 Cal.Rptr.3d 390, 74 P.3d 166].)
To be sure, the policy behind section 66427.5 is an important oneto encourage conversions of mobilehome parks to resident ownership while protecting nonpurchasing residents. (See El Dorado Palm Springs, Ltd. v. City *1485 of Palm Springs, supra, 96 Cal.App.4th at p. 1172; Sequoia Park Associates v. County of Sonoma, supra, 176 Cal.App.4th at p. 1298; Health & Saf. Code, § 50780, subd. (b).)
(15) But the policy considerations behind the Coastal Actas well as the Mello Act, inasmuch as its genesis was the Coastal Act (Coalition of Concerned Communities, Inc. v. City of Los Angeles, supra, 34 Cal.4th at p. 741 (conc. opn. of Moreno, J.))are far more extensive. The Coastal Act seeks to ensure a balance between protection of coastal resources and development, by providing a comprehensive statutory scheme regulating land use planning throughout the coastal zone. (Pub. Resources Code, § 30001; Yost v. Thomas, supra, 36 Cal.3d at pp. 565-566.) As the Legislature has declared, "the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people . . .," and "the permanent protection of the state's natural and scenic resources is a paramount concern to present and future residents of the state and nation," which requires "[t]hat existing developed uses, and future developments [be] carefully planned and developed consistent with the policies of [the Coastal Act]." (§ 30001, subds. (a), (b), (d).) With regard to the low- and moderate-income housing preservation provision originally found in the Coastal Act, and now found in the Mello Act, the Coastal Commission stated that it "`is a recognition that meaningful access to the coast requires housing opportunities as well as other forms of coastal access.' [Citation.] `The access, economic development and environmental policies of the Coastal Act all provide that the coastal zone will not be the domain of a single class of citizens but will instead remain available to the entire public; the provision of affordable housing benefits not only those who live in it but all members of society.'" (Coalition of Concerned Communities, Inc. v. City of Los Angeles, supra, 34 Cal.4th at p. 741 (conc. opn. of Moreno, J.), quoting Cal. Coastal Com., Interpretive Guidelines on New Construction of Housing (1981) § II.A, p. 13 § II.B, p. 14.)
(16) In light of the "paramount concern" for protecting coastal resources by regulating development as expressed in the Coastal Act (and by implication, the Mello Act), we conclude that section 66427.5 does not preclude the City from imposing conditions and requirements mandated by the Mello Act and Coastal Act on a subdivider seeking to convert to resident ownership a mobilehome park located in the coastal zone.[11]

*1486 DISPOSITION
The judgment is reversed. The trial court is directed to vacate the peremptory writ of mandamus issued May 7, 2009, and to enter judgment in favor of the City of Los Angeles. The City shall recover its costs on appeal.
Epstein, P.J., and Manella, J., concurred.
NOTES
[1] Further undesignated statutory references are to the Government Code.
[2] A year later, on November 19, 2008 (while this case was before the trial court), the City sent a "Letter of Correction" to Palisades Bowl's representatives stating that the list should be corrected to delete item No. 1 (no application for zone change or general plan amendment was necessary) and to change the reference in item No. 5 from "Parcel Map" to "tentative tract map" using form No. CP-6110 rather than No. CP-1801.
[3] The petition/complaint asserted four causes of action: for administrative mandamus (Code Civ. Proc., § 1094.5), for traditional mandamus (Code Civ. Proc., § 1085), for declaratory relief, and for injunctive relief.
[4] The court also found that the City's refusal to accept Palisades Bowl's application for filing was unlawful, because it would render the Permit Streamlining Act meaningless.
[5] The amendments to the petition/complaint went far beyond the scope of the court's order granting leave, however, and the trial court granted the City's motion to strike those portions that exceeded the scope (including the addition of another defendant, the Residents' Association).
[6] We note that, although these were the only issues raised in the cross-appellant's opening brief portion of Palisades Bowl's initial brief on appeal, a significant portion of its reply brief on the cross-appeal addressed other issues, namely issues raised in the City's appeal. Inclusion of those issues in the reply brief was improper. (Cal. Rules of Court, rule 8.216(b)(3).) Therefore, we grant the City's motion to strike pages 26-37 of Palisades Bowl's reply brief. Palisades Bowl also filed a request for judicial notice in conjunction with its reply brief, asking us to take judicial notice of portions of the legislative history relating to section 66427.5. Those documents relate only to the issues in the City's appeal, and have no relevance to the issues in the cross-appeal. Therefore, we deny that request as untimely. In any event, two of the documents for which Palisades Bowl seeks judicial notice are letters from a single legislator (albeit the bill's author) to the Governor and to another legislator; such letters generally are not considered in construing a statute. (Quintano v. Mercury Casualty Co. (1995) 11 Cal.4th 1049, 1062 [48 Cal.Rptr.2d 1, 906 P.2d 1057].) The third document, a Senate Select Committee on Mobilehomes Bill Analysis, although a proper subject of judicial notice, provides no insight into the legislative intent regarding the issue presented in this appeal whether section 66427.5 precludes the application of the Mello Act and Coastal Act to the conversion of mobilehome park within the coastal zone.
[7] Palisades Bowl has asked us to take judicial notice of a checklist for mobilehome park conversions the City recently adopted. This document is not relevant to the issue here, and therefore we deny the request. (Mangini v. R.J. Reynolds Tobacco Co. (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73] [only relevant materials may be judicially noticed], overruled on another ground in In re Tobacco Cases II (2007) 41 Cal.4th 1257 [63 Cal.Rptr.3d 418, 163 P.3d 106].)
[8] Palisades Bowl has asked us to take judicial notice of the municipal code sections at issue. We grant that request.
[9] If the local government exercises this option, it must adopt a resolution establishing those procedures, notify the Coastal Commission, and take appropriate steps to notify the public. Once it does so, "[t]he provisions of subdivision (b) of [Public Resources Code] Section 30600 shall take effect and shall be exercised by the local government . . . ." (Pub. Resources Code, § 30620.5, subd. (b).)
[10] Typically, housing units for low- or moderate-income persons or families are provided and preserved through the use of recorded covenants or deed restrictions that restrict the sale or rental of those units to qualified persons or families for a period of time, ranging from five years to infinite duration. (See Padilla, Reflections on Inclusionary Housing and a Renewed Look At Its Viability (1995) 23 Hofstra L.Rev. 539, 554-555.) Under the interim Mello Act administrative procedures adopted by the City and currently in use, the restrictions apply for not less than 30 years.
[11] In our decision in Colony Cove filed today, we noted the uncertainty created by section 66427.5 regarding the issue involved in that case: how local agencies are to consider and use resident surveys in the subdivision map hearing. (Colony Cove Properties, LLC v. City of Carson, supra, 187 Cal.App.4th at p. 1508, fn. 18.) Referring to Colony Cove and the present case, we stated our hope that the Legislature "will recognize the dilemma faced by local agencies illustrated by [these cases] . . ., and act to clarify the scope of [local agencies'] authority and responsibilities" in considering mobilehome park conversion applications. (Ibid.) We repeat that hope here.